LILJEBERG, J.
hln this medical malpractice case, plaintiff, Coley Purvis, appeals the trial court’s judgment rendered in favor of defendant, the Louisiana Patient’s Compensation Fund (“PCF”), dismissing plaintiffs claims against it with prejudice. For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
On November 5, 2007, Mr. Purvis experienced an onset of acute appendicitis and was taken to the emergency room at West Jefferson Medical Center (“WJMC”). The next day, November 6, 2007, surgery was performed by Dr. Todd Belott, assisted by Dr. Lance Burns. During the surgery, while the operating table was in the Tren-delenburg [1] position, Mr. Purvis, who was under general anesthesia, began to slide off the operating room table and ended up on the floor. The parties dispute the speed at which Mr. Purvis struck the floor, with plaintiff arguing that his injuries show he struck the floor at a rapid rate of speed and the PCF arguing that Dr. Belott grabbed Mr. Purvis about six to twelve inches above the floor and carefully placed or guided him to the floor. After the accident, Mr. Purvis was returned to the operating table, the room was re-prepped, and the appendectomy was completed.
Later that evening, while Mr. Purvis was in recovery, Dr. Belott and Dr. Burns told him about the fall, after Mr. Purvis indicated that he was having shoulder, head, and neck pain. Cervical spine x-rays were performed, which did not show any fracture. Mr. Purvis was discharged from the hospital on November 8, 2007. However, he returned to see Dr. Belott on November 19, 2007, with complaints of abdominal pain, low grade fever, nausea, mild to moderate neck and arm pain, and numbness in the right arm. Mr. Purvis was readmitted to the 12hospital and referred to Dr. Steven Atkins for a neurological consultation. In his consultation report, Dr. Atkins found that plaintiff had “[cjervical radiculopathy on the right specifically at the level of C6 with neck pain, arm pain, and paresthesias.” A cervical MRI also revealed that plaintiff had a disc bulge at C3-C4 indenting the thecal sac. Mr. Purvis was discharged from the hospital on November 21, 2007.
Mr. Purvis filed this lawsuit against several defendants, including WJMC, Dr. Be- *367 lott, Dr. Burns, Dr. Levin[2] and others.[3] Mr. Purvis asserts that as a result of the accident, he sustained several injuries, including cervical herniated discs and bulging, aggravation of a preexisting lumbar herniated disc producing radiculopathy, anxiety, depression, and a traumatic brain injury resulting in a seizure disorder, rendering him totally and permanently disabled.
Prior to trial, Drs. Belott, Burns, and Levin were dismissed from this case via summary judgments. Mr. Purvis also filed a Motion for Partial Summary Judgment arguing that he was entitled to judgment as a matter of law as to the liability of WJMC, because the WJMC nurses were unquestionably negligent in failing to secure him to the operating table, which caused his fall and the resulting injuries. The trial court granted partial summary judgment on the issue of liability, finding WJMC liable for its nurses’ failure to properly secure Mr. Purvis to the operating table. The trial court noted that the issues of medical causation and damages were preserved for trial on the merits. Thereafter, Mr. Purvis and WJMC reached a confidential settlement. Mr. Pur-vis then pursued recovery for damages in excess of $100,000 from the PCF.
A judge trial was conducted from September 21-23, 2015, and then completed on November 17, 2015. At trial, Mr. Purvis testified that at the time of the accident, he was living in Miami and working for Estee Lauder as the senior 1 ..¡coordinator of special events. He was on vacation in New Orleans and about to return home when his symptoms of acute appendicitis began, and he was taken to WJMC. Mr. Purvis stated that he has not been able to work since the accident and has suffered significant economic loss and loss of lifestyle as a result of the accident. Mr. Purvis’ longtime partner, Nigel Hartzog, also testified about the decline in their financial status and lifestyle as a result of the accident.
According to Mr. Purvis, due to the pain caused by the accident, he can no longer perform the physical demands and travel associated with his job at Estee Lauder. He testified that he loved his job and never missed any work before the accident, other than a couple of days in 2006 when he pulled some muscles in his back after reaching for and picking up his computer bag. Mr. Purvis admitted that prior to the accident, he saw a chiropractor, Dr. Robert Whitney, for stiffness and muscle tension in his neck and shoulders, which was likely caused by his extensive travel for work. His first visit with Dr. Whitney was in April of 2005. However, he maintained that he treated before the instant accident solely for muscle issues, not spinal or disc pathology. He stated that he did not need epidural steroid injections before the accident and he did not have neck pain that radiated down his right shoulder into his hand with resulting paresthesias and tingling until after the accident. He also did not have seizures before the instant accident.
Mr. Purvis also admitted that he saw Dr. Michael Wohlfeiler, an internist, before the accident for anxiety issues primarily related to a stressful work situation with a colleague. Dr. Wohlfeiler prescribed Lexa-pro, a medication for anxiety and depression. Mr. Purvis also saw Dr. Wohlfeiler *368 for back pain after the incident when he reached for and picked up his computer bag. However, Mr. Purvis described his back problems prior to the accident as minor, and he did not believe Dr. Wohlfeiler ever informed him that he had a herniated disc in his back. According to Mr. Purvis, he could perform the requirements of his job and had a | ¿great life before the accident, but he has had excruciating pain since the accident and has been unable to work. He maintained that his pain after the accident has been different and much more severe than any pain he had before the accident.
Mr. Purvis was questioned about surveillance videos that were taken of him. One of the surveillance videos was taken on February 5, 2013, and it shows Mr. Purvis and Mr. Hartzog loading a pickup truck with several items, including a mattress and box spring, when they were moving from Florida to Alabama. Mr. Purvis testified that the physical activity he was doing on the surveillance video, including bending and lifting, was very unusual for him. He stated that he cannot bend or reach over his head, as shown on the video, on a regular basis, but he would have been able to do so prior to the accident. Mr. Purvis initially stated that he was not lifting the mattress in the surveillance video, but was guiding it, with Mr. Hartzog bearing most of the weight. However, after counsel pointed out that Mr. Purvis is shown with his hands underneath the mattress and with the mattress in an elevated position, he admitted that it was “fair to say” that he was lifting the mattress off the truck.
Mr. Purvis was also questioned about a Social Security Administration form that was filled out by Dr. Troy Beaucoudray in 2011, indicating that Mr. Purvis could not lift over ten pounds, that he could not sit, stand, or walk for more than 15 minutes without interruption, and that he could not sit, stand, or walk for more than two hours in a work day. The document also indicates that Mr. Purvis could never reach overhead or push/pull with either hand, climb stairs or ramps, stoop, kneel, crouch, or crawl. The 2013 surveillance video contradicts these claims, as Mr. Purvis is shown performing some of these activities.[4]
While Mr. Purvis did not fill out the Social Security Administration form, he testified that it was true both in 2011, when the form was filled out, and in 2014, | ¿when his deposition was taken, that he could not sit, stand or walk for more than 15 minutes without medication. He also testified that it was true in both 2011 and 2014 that he could not reach overhead, push/pull with either hand, climb stairs or ramps, stoop, kneel, crouch or crawl. He admitted that the form does not contain any reference to “with medication” or “without medication.”
With regard to his claims of anxiety and depression caused by the accident, Mr. Purvis testified that while he had been taking a medication for depression and anxiety before the accident, it was due to a workplace issue with a colleague and the death of his brother in 2006. He stated that he did not see a psychiatrist until this accident, and the problems he has had since the accident are completely different from his anxiety issues before the accident.
Dr. Mortezia Shamsnia was accepted as an expert in neurology. Dr. Shamsnia testified that he first saw Mr. Purvis on January 25, 2008 for complaints of neck pain, low back pain, and pain and paresthesia in the limbs. According to Dr. Shamsnia, Mr. Purvis informed him that he developed *369 these symptoms after the November 6, 2007 surgery. He testified that an EMG and diagnostic tests performed in February of 2008 revealed right C5 radiculopa-thy and left C4 radiculopathy. An MRI from February of 2008 showed a cervical disc herniation at C3-C4 with bulging discs below, and a lumbar disc herniation at L5-S1. He stated that a brain MRI from February 2008 showed a nonspecific finding, and an EEG showed some abnormal discharges from the left frontal temporal lobe of the brain. Dr. Shamsnia diagnosed Mr. Purvis with a seizure disorder and prescribed anti-seizure medication.
Based on the test results and the history provided by Mr, Purvis, Dr. Shamsnia related Mr. Purvis’ injuries to the accident in the operating room on November 6, 2007. However, on cross-examination, Dr. Shamsnia admitted that he did not know what happened to Mr. Purvis before 2007 because Mr. Purvis had 1 finot given him a complete history. He acknowledged that the patient’s medical history is the foundation of establishing a causal relationship between an incident and injuries. He admitted that he did not have access to any of Mr. Purvis’ medical records from before the accident, including records of his treatment with Dr. Whitney and Dr. Wohlfeiler for neck and back pain and anxiety. Dr. Shamsnia testified that Mr. Purvis never told him about his preexisting lumbar disc herniation at L5-S1 or that Dr. Whitney treated him before the accident for cervical spondylosis, brachial neuritis, rotator cuff problems in 2006, difficulty walking in 2005, and other issues. He was unaware that Mr. Purvis had been treated for anxiety and depression before the accident as well, or that he had been placed on work restrictions in August of 2007 by Dr. Whitney.
Dr. Shamsnia testified that his seizure diagnosis was based on the patient’s subjective complaints and history, as well as an abnormal, but nonspecific, EEG that did not indicate brain' trauma. He admitted that he would not have related Mr. Purvis’ herniated.disc in his back to the accident if he had known that he was diagnosed with an L5-S1 disc herniation in 2006.
Dr. Troy Beaucoudray, an expert in neurology and pain medicine, testified that he first saw Mr. Purvis on September 9, 2009. Based on the history provided by Mr. Pur-vis and Dr. Shamsnia’s records, Dr. Beau-coudray diagnosed Mr. Purvis with traumatic brain injury, a seizure disorder, and chronic neck and low back pain. Dr. Beau-coudray related Mr. Purvis’ neck and back pain and his seizure disorder to the fall from the operating table at WJMC. He has been administering epidural steroid injections to Mr. Purvis at an average of two injections per year. Dr. Beaucoudray has also continued Mr. Purvis on seizure and pain medications, though he could not specify how long Mr. Purvis would require these medications.
On cross-examination, Dr. Beaucoudray admitted that he had not reviewed any medical records from before the November 6, 2007 accident. He agreed with UDr. Shamsnia that history is the foundation in treating a patient and establishing a causal relationship between an incident and a patient’s injuries. He further agreed that a diagnosis of chronic pain is largely based on what the patient reports. In his deposition, Dr. Beaucoudray admitted that there was no clinical objective data to support a finding of a traumatic brain injury. Dr. Beaucoudray also admitted that Mr. Pur-vis did not inform him that he was treated for anxiety, insomnia, cervical spondylosis, and brachial neuritis prior to the accident, or that he had been placed on work restrictions in August of 2007.
The deposition of Dr. Robert Whitney, a chiropractor and doctor of naturopathic *370 medicine based in Florida, was admitted into evidence in lieu of live testimony. The records of his treatment of Mr. Purvis were admitted as well. Dr. Whitney treated Mr, Purvis in April of 2005 for complaints of lower back pain and shoulder pain. In June of 2005, Dr. Whitney treated Mr. Purvis for neck pain, swelling, and inflammation, as well as “loss of range of motion and palpable splinting spasms.” In July of 2005, Dr. Whitney placed Mr. Pur-vis on partial work restrictions. Dr. Whitney continued to treat Mr. Purvis before the accident, primarily for neck pain and low back pain. Physical capacity testing was performed in 2005, and Mr. Purvis complained of low back pain, neck pain, and shoulder pain during the tests performed. In January of 2007 and August of 2007, Dr. Whitney placed Mr. Purvis on “no work status,” due to his neck and back pain, loss of range of motion, and “palpable splinting spasms.” He diagnosed Mr. Pur-vis with cervicalgia and cervicocranial syndrome, and then in August of 2007, he diagnosed him with cervical brachial syndrome.[5]
Dr. Whitney also saw Mr. Purvis in November of 2007 after the accident. In his notes, Dr. Whitney indicated that Mr. Pur-vis has a chronic history of pain 1 ¿problems. He testified that the type of treatment he provided to Mr. Purvis before and after the accident was the same. Dr. Whitney also testified that physical performance tests were performed in 2005, before the accident, and in December of 2007, after the accident, and there was no significant difference between the 2005 and 2007 test results.
Dr. Michael Wohlfeiler, an internist, also treated Mr. Purvis in Florida before the accident. Dr. Wohlfeiler testified in his deposition that his records indicate he first saw Mr. Purvis in July of 2006. He prescribed Lexapro for Mr. Purvis for his anxiety and depression. During his treatment of Mr. Purvis, Dr. Wohlfeiler also prescribed anti-anxiety medication due to Mr. Purvis’ complaints of panic attacks, insomnia, inability to concentrate, depression, and acute anxiety. Mr. Purvis also complained of lower back pain, right hand pain, and heel spurs. An MRI performed in October of 2006 revealed a disc herniation at L5-S1 and nerve encroachment at L5-S1. Dr. Wohlfeiler testified that this could cause pain to radiate into the lower extremities. In October of 2006, Dr. Woh-feiler instructed Mr. Purvis not to lift anything over 20 pounds for two weeks.
Dr. Austin Sumner, an expert in neurology, performed an independent medical examination of Mr. Purvis. According to Dr. Sumner, he reviewed several depositions and a substantial amount of medical records and reports, including the medical records of WJMC, Dr. Shamsnia, Dr. Beaucoudray, Dr. Wohlfeiler, and other doctors, as well as the surveillance videos of Mr. Purvis taken before trial. Dr. Sumner opined that Mr. Purvis has suffered from chronic pain syndrome since 2005 and it has been “characterized by dramatic acting out of symptomology,” and “depression, dependency and seeking disability.” He stated that Mr. Purvis has required continuous treatment since 2005 for his pain, including narcotic medication.
|flBased on his review of the medical records, reports, depositions, and his ex *371 amination of Mr. Purvis, Dr. Sumner believes that Mr. Purvis sustained a minor nerve injury to the right median nerve, resulting in some numbness of the thumb and index finger, as a result of slipping from the operating table. However, he does not believe that Mr. Purvis sustained any injury to his neck or brain or any seizures as a result of the accident. He believes the incident of slipping from the table produced only a “minor and completely reversible injury to a single nerve in his right arm.”
Dr. Sumner testified that the radiological changes in Mr. Purvis’ neck are degenerative changes due to aging. Dr. Sumner did not find any evidence that Mr. Purvis suffered a traumatic brain injury. He found no evidence of head trauma in the MRI performed in February of 2008, and he found the EEG results were not consistent with seizures occurring as frequently as Mr. Purvis claims. He testified that the symptoms Mr. Purvis reported to Dr. Shamsnia were more consistent with anxiety attacks than with epileptic seizures. He opined that Dr. Shamsnia’s evaluation was not a comprehensive neurological evaluation because he was not provided with relevant details of Mr. Purvis’ medical history.
Finally, based on his review of the medical records and the independent medical examination, Dr. Sumner believes that Mr. Purvis is physically able to work. He stated that Mr. Purvis can move all his extremities, his muscles develop normal strength, and he does not have a brain injury that would preclude him from intellectually functioning at the capacity in which he previously functioned. He opined that “the only sense in which Mr. Purvis is disabled is in Mr. Purvis’ mind.”
At the conclusion of trial, the trial judge allowed the parties time to submit post-trial memoranda and subsequently took the matter under advisement. On February 5, 2016, the trial judge rendered a judgment in favor of the PCF and against Mr. Purvis, dismissing plaintiffs claims with prejudice at plaintiffs costs. |inThe trial court also issued lengthy reasons for judgment, finding that Mr. Purvis failed to carry his burden of proving by a preponderance of the evidence that his damages exceed $100,000.
In his reasons for judgment, the trial judge found that Mr. Purvis slid from the operating table and struck his head hard enough to suffer a minor closed head injury resulting in a seizure disorder. He stated that Mr. Purvis had no history of seizures-like symptoms prior to the accident and his seizures “came under control” after he was prescribed anti-seizure medication. However, he stated that Mr. Purvis did not elaborate or distinguish any post-accident symptoms from the alleged new symptoms, noting that he had a difficult time concentrating and suffered from insomnia before the accident.
The judge found that Mr. Purvis also struck the floor hard enough to suffer cervical radiculopathy and an aggravation of his pre-existing cervical injuries. However, the trial judge stated that he was unable to determine the extent and duration of the cervical radiculopathy and aggravation of his cervical injuries given plaintiffs lack of reliable expert medical testimony. The judge stated that Mr. Pur-vis did not provide any expert medical testimony as to how the symptoms from the cervical radiculopathy significantly differ from: 1) Mr. Purvis’ earlier diagnosis of cervical brachial syndrome, which Dr. Wohlfeiler testified causes pain in the neck and shoulder that may radiate into the arm and hand; or 2) the pain he was already experiencing in his right hand. He also found that Mr. Purvis failed to provide reliable expert medical testimony *372 proving by a preponderance of the- evidence that the diagnosis of herniation and bulging of the cervical spine was an acute injury caused by the fall.
The trial judge further found that Mr. Purvis failed to prove by a preponderance of the evidence that his pre-existing lumbar injuries were aggravated by tfie fall, noting that Mr. Purvis had chronic low back pain from his | nL5-Sl disc herniation before the accident and that he did not complain of lower back pain immediately after the surgery. He also noted that although Mr. Purvis denied any prior radiation of pain into the lower extremities, the medical records indicate that he previously experienced “inflammation to the lower back radiating down his leg” and “intermittent/positional radiation bilateral glutes.”
The trial judge concluded that Mr. Pur-vis was injured as a result of the accident, but his argument that his prior neck and back issues were only muscular before the accident was not persuasive, noting that the medical records of Dr. Whitney and Dr. Wohlfeiler prove otherwise. The trial judge also found that while Mr. Purvis suffers from anxiety and depression as a result of the fall, he could not deteimine how much different this anxiety is from what he was suffering before the accident.
Finally, the trial judge found that the lack of evidence regarding causation' not only negatively impacted the value of the general damages, but also negatively impacted the value of the special damages sought by plaintiff, noting that he could not determine how the injuries sustained or aggravated by the fall affected Mr. Pur-vis’ past and future medical expenses or his ability to work.
Mr. Purvis appeals the trial court’s judgment.
LAW AND DISCUSSION
The primary issue on appeal is whether or not the trial court erred by finding that Mr. Purvis did not prove he sustained damages in excess of $100,000 as a result of the accident. Mr. Purvis sets forth several arguments in support of his claim that the trial court’s judgment should be reversed and that substantial damages should be awarded.
On appeal, a reviewing court may not set aside a trial judge’s finding of fact in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). To reverse a fa'ct-finder’s determination, the appellate |12court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and that the record establishes that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120, 1127 (La. 1987). Where the trial judge’s findings are reasonable in light of the record viewed in its entirety, the court of appeal may not reverse, even if it is convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Rosell, 549 So.2d at 844; McGlothlin v. Christus St. Patrick Hospital, 10-2775 (La. 7/1/11), 65 So.3d 1218. The reason for this is based not only upon the trial court’s better capacity to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between respective courts. McGlothlin, 65 So.3d at 1230-1231.
Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, where conflict exists in the testimony. Goudia v. Mann, 11-960 (La.App. 5 Cir. 5/22/12), 98 So.3d 364, 372, writ denied, 12-1423 (La. 10/8/12), 99 So.3d 1007. The trier of fact is required to assess the credibility of both expert and lay witnesses to determine the most credible evidence. *373 Johnson v. E.I. DuPont deNemours & Co., Inc., 08-628 (La.App. 5 Cir. 1/13/09), 7 So.3d 734, 741. Appellate courts apply the manifest error standard in deciding conflicts between expert and lay testimony. Id.
In a medical malpractice action, the plaintiff must establish, by a preponderance of the evidence, the standard of care applicable to the health care provider, a breach of that standard of care, and a causal connection between the breach and the plaintiffs injuries. La. R.S. 9:2794; Gonzales v. Ochsner Clinic Found., 14-873 (La.App. 5 Cir. 5/14/15), 170 So.3d 1099, 1102-1103. At a trial against the PCF, the plaintiff has the burden of proving that the malpractice caused damages in excess of $100,000. Graham v. Willis-Knighton Medical Center, 97-0188 (La. 9/9/97), 699 So.2d 365.
|1RIn order to establish a causal connection between a health care provider’s negligent conduct and his injuries, the plaintiff must prove that it is more probable than not that his injuries were caused by the substandard care. Pfiffner v. Correa, 94-924, 94-963, 94-992 (La. 10/17/94), 643 So.2d 1228, 1230; Carter v. LAMMICO, et al., 09-1310 (La.App. 3 Cir. 5/19/10), 40 So.3d 327, 330. Before recovery can be granted for aggravation of a pre-existing condition, a causative link between the accident and the victim’s current status must also be established. Bennett v. Louisiana Farm Bureau Cas. Ins. Co., 43,216 (La.App. 2 Cir. 4/30/08), 983 So.2d 966, 972.
In his first assignment of error, Mr. Purvis asserts that the trial court correctly concluded that he suffered a traumatic brain injury resulting in a seizure disorder, but it committed manifest error in finding that his seizures were completely controlled by medication and in failing to award damages and medical expenses. He asserts that the testimony and evidence clearly show that he did not suffer from seizures until after the accident and that he will continue to need treatment and medication for his seizure disorder.
The trial court considered the testimony and evidence and found that Mr. Purvis struck his head hard enough on the operating room floor to suffer a minor closed-head injury, but he did not find that Mr. Purvis suffered a traumatic brain injury. Mr. Purvis argues that the trial judge erroneously found that his seizures were controlled by medication, claiming that he has continued to have some seizures even while on medication. Mr. Purvis relies heavily on the testimony of Dr. Beaucoud-ray in his argument that his seizure condition will require medical monitoring and medication for the rest of his life and that the cost will exceed $100,000.
At trial, Mr. Purvis testified that he still had some seizures while on medication and that he had one during the week before trial. However, it is noted | uthat Mr. Purvis testified that this latest seizure occurred after he cut the dosage in half based on recommendations from his doctors that he try to not take some medications as frequently. Mr. Hartzog testified that Mr. Purvis still has seizures “from time to time” but they are “at bay most of the time” with the seizure medication.
The plaintiff bears the burden of proving entitlement to special damages, including future medical expenses, by a preponderance of the evidence. Dufrene v. Gautreau Family, L.L.C., 07-467 (La.App. 5 Cir. 2/22/08), 980 So.2d 68, 83, writs denied, 08-629 (La. 5/9/08), 980 So.2d 694 and 08-628 (La. 5/9/08), 980 So.2d 698. In order to recover future medical expenses, the plaintiff must prove that these ex *374 penses will be necessary and inevitable. Gunn v. Robertson, 01-347 (La.App. 5 Cir. 11/14/01), 801 So.2d 555, 565, writ denied, 02-170 (La. 3/22/02), 811 So.2d 942. Future medical expenses must be established with some degree of certainty and must be supported with medical testimony and estimation of probable costs. Id.
At trial, Dr. Beaucoudray testified that he has continued Mr. Purvis on his seizure and pain medications, but he could not specify how long Mr. Purvis would continue to require these medications. In his reasons for judgment, the trial court noted that Mr. Purvis has continued to drive despite warnings from his doctors regarding seizures. The trial judge could have considered this evidence when considering the severity of Mr. Purvis’ seizure condition.
Although the trial judge found that Mr. Purvis suffered seizures as a result of the accident, Mr. Purvis did not establish with some certainty the amount of his special damages for seizure medication and future medical monitoring that is necessitated by the accident in this case. Because Mr. Pur-vis did not prove these special damages by a preponderance of the evidence, we find no merit in this assignment of error.
| isln his second assignment of error, Mr. Purvis argues that the trial court correctly found that the accident caused a new condition of cervical radiculopathy, but it committed manifest error in its opinion that Mr. Purvis did not show how the symptoms from cervical radiculopathy “significantly differed from an earlier diagnosis of cervical brachial syndrome and the pain he was already experiencing in his right hand.” Mr. Purvis claims that the medical and lay testimony revealed that he never had cervical radiculopathy before the accident.
The evidence shows that Mr. Purvis began treating with Dr. Whitney in 2005 for neck pain, swelling, and inflammation, as well as “loss of range of motion and palpable splinting spasms.” In August of 2007, Dr. Whitney placed Mr. Purvis on “total, no work status,” due to his neck and back pain, loss of range of motion, and “palpable splinting spasms.” He diagnosed Mr. Pur-vis with cervicalgia and cervicocranial syndrome, and then in August of 2007, he diagnosed him with cervical brachial syndrome. Dr. Wohlfeiler described cervical brachial syndrome as “pressure or stretching of the brachial plexus” and stated that it causes pain in the neck and shoulder and may radiate into the arm and hand.
Although Dr. WTiitney testified that Mr. Purvis’ cervical pains were greater after the accident, the trial judge found Dr. Wdiitney’s opinions to be “of limited usefulness” because he did not review any of the post-fall medical records of the other providers. The trial judge stated that he was unable to determine the extent and duration of the cervical radiculopathy and aggravation of his pre-existing cervical injuries given the lack of reliable expert testimony.
Considering the testimony and evidence, we find no manifest error in the trial judge’s finding that Mr. Purvis did not distinguish the symptoms of cervical radi-culopathy caused by the accident from the cervical issues he had before the accident. Thus, Mr. Purvis did not meet his burden of proving by a preponderance of the evidence the aggravation of his prior cervical issues or that his new l^symptoms from cervical radiculopathy differed from his prior neck pain. This assignment of error is without merit.
In his third assignment of error, Mr. Purvis argues that the trial court erred by stating that he failed to provide reliable expert testimony showing that the cervical disc herniation and bulging of the *375 cervical spine were caused by the fall. He claims that there is no other event that could have precipitated these findings other than the fall from the operating table at WJMC.
An MRI taken in February of 2008 showed that Mr. Purvis had a herniated disc at C3-C4, as well as bulging discs at C4-C5 and C5-C6. Although Dr. Shamsnia and Dr. Beaucoudray related Mr. Purvis’ neck injuries to the accident, the trial judge apparently did not accept their testimonies as sufficient proof of medical causation. The trial judge stated that he did not find the opinions of Dr. Shamsnia or Dr. Beaucoudray regarding medical causation to be reliable because neither doctor ever reviewed or considered Mr. Purvis’ pre-accident medical records before rendering his opinion.
A fact-finder may accept or reject the opinion expressed by an expert, in whole or in part. Skillman v. Riverside Baptist Church of Jefferson Parish, 14-727 (La.App. 5 Cir. 5/28/15), 171 So.3d 407, 418. The weight to be given to expert testimony is dependent on the facts on which it is based, as well as the professional qualifications and experience of the expert. Glass v. Magnolia School, Inc., 01-1209 (La. App 5 Cir. 3/13/02), 815 So.2d 143, 153-154, writ denied, 02-1048 (La. 6/7/02), 818 So.2d 776; Gulf Outlet Marina, Inc. v. Spain, 02-1589 (La.App. 4 Cir. 6/25/03), 854 So.2d 386, 393, writ denied, 03-2075 (La. 11/7/03), 857 So.2d 497. The effect and weight to be given to expert testimony is within the broad discretion of the trial judge. Gulf Outlet Marina, Inc., 854 So.2d at 394.
Considering Mr. Purvis’ prior history of neck pain and related medical issues, we cannot say that the trial judge erred by finding that he failed to prove by [17a preponderance of the evidence that the cervical disc herniation and bulging discs were caused by the accident. This assignment of error is without merit.
In his fourth assignment of error, Mr. Purvis argues that the trial court correctly found that he suffered from anxiety and depression as a result of the accident, but the trial court erred in stating that he was unable to determine if this differed from his anxiety prior to the accident. He asserts that the evidence shows that he did not see a psychiatrist before the accident and that the only sources of his anxiety and depression before the accident were the death of his brother and a work-related issue with a co-worker. Mr. Purvis notes that since the accident, he has seen psychiatrists who agree that he has suffered major depression as a result of the accident.
Mr. Purvis saw Dr. Josephine Sabhar-wal, a psychiatrist, after the accident and her records reflect that he was well before the accident, had a very successful job, traveled a lot and enjoyed his life, but after the accident, he lost his house and developed anxiety and depression. Dr. Sa-bharwal found that he had major depressive disorder, chronic pain, and psychosocial environmental problems due to the accident, and she placed him on medication. Mr. Purvis saw another psychiatrist, Dr. Leona Graham, and reported that he has had chronic pain, seizure disorder, and stress since the accident. He claims that he never complained of these problems before the accident.
The trial court found that while Mr. Purvis suffers from anxiety and depression as a result of the accident, due to the extent of his previous injuries, it was unable to determine how much different this anxiety is from what he was already suffering before the accident.
The record reflects that Mr. Purvis had anxiety and depression before *376 the instant accident. He claims that these conditions became much worse after the accident. If a defendant’s conduct aggravates a pre-existing condition, the 118defendant is liable to the extent of the aggravation. Miramon v. Bradley, 96-1872 (La.App. 1 Cir. 9/23/97), 701 So.2d 475, 478. The plaintiff has the burden of proving cause-in-fact damages by a preponderance of the evidence. Id.
Differentiating between damages caused by an accident and damages caused by the normal progression of a plaintiffs pre-existing condition often presents complex legal and medical issues. Chavers v. Travis, 04-992 (La.App. 4 Cir. 4/20/05), 902 So.2d 389, 395. Given the complexity of the issue, this analysis generally turns on expert medical evidence. Id. The factual basis for an expert opinion determines the credibility of the opinion. Miramon, 701 So.2d at 478.
Mr. Purvis asserts that before the accident, he had a great job and happy life, including travel, entertainment, and financial security. He claims that his entire lifestyle changed as a result of the accident. However, the medical records cast some doubt on Mr. Purvis’ claims pertaining to his life before the accident. The medical records show that before the accident, Mr. Purvis suffered from neck and back pain, and in January and August of 2007, he was put on a “no work status,” due to his neck and back pain, loss of range of motion, and “palpable splinting spasms.” Further, before the accident, Mr. Purvis saw Dr. Wohlfeiler for anxiety issues and took medication for anxiety and depression.
It was plaintiffs burden to prove with competent medical evidence the difference between his pre-accident and post-accident anxiety and depression. We cannot say that the trial court erred by finding that Mr. Purvis failed to prove the degree of depression and anxiety he suffered as a result of the accident. This assignment of error is without merit.
In his fifth assignment of error, Mr. Purvis argues that the trial judge erred in discounting Mr. Purvis’ testimony that the medical issues pertaining to his neck and back prior to the accident were only minor and muscular in nature on the basis that the medical records of Dr. Whitney and Dr. Wohlfeiler prove otherwise. He | margues that the lay and medical testimony shows that his cervical complaints, including muscle tension and spasm, were minor before the accident, and that he did not have any radiculopathy before the accident. He also did not need epidural steroid injections or significant medical treatment prior to the accident.
The medical records of Dr. Whitney and Dr. Wohlfeiler show that Mr. Purvis had neck and back pain prior to the accident. Dr. Whitney treated Mr. Purvis for neck and back pain from April of 2005 until the accident. He even placed him on “no work status” in August of 2007. Dr. Whitney diagnosed Mr. Purvis with cerviealgia and cervicocranial syndrome, as well as cervical brachial syndrome, before the accident.
Dr. Whitney also saw Mr. Purvis in November of 2007 after the accident. He testified that the type of treatment he provided to Mr. Purvis before and after the accident was the same. Dr. Whitney also testified that physical performance tests were performed both in 2005 and in December of 2007, and there was no significant difference between the 2005 and 2007 test results.
The trial court found that Mr. Purvis’ claim of only minor neck and back problems before the accident was not persuasive. We find ample support for this finding in the record before us. Accordingly, this assignment of error is without merit.
*377 In his sixth assignment of error, Mr. Purvis argues that the trial judge erred by stating that he did not prove by a preponderance of the evidence that his preexisting lumbar injuries were aggravated by the fall. He claims that although he was diagnosed with L5-S1 disc herniation prior to the accident, it did not impede his lifestyle or ability to work. Further, he claims that there is no evidence of any pain radiation into the lower extremities until after the accident.
An MRI performed in October of 2006 revealed a disc herniation at L5-S1, and nerve encroachment at L5-S1, and Dr. Wohlfeiler testified that this could 1 ancause pain to radiate into the lower extremities. The trial judge noted that Mr. Purvis had chronic low back pain from his L6-S1 herniation before the accident and that he did not complain of lower back pain immediately after the appendectomy. He also noted that although Mr. Purvis denied any prior radiation of pain into the lower extremities, the medical records indicate that he previously experienced “inflammation to the lower back radiating down his leg” and “intermittent/positional radiation into bilateral glutes.”
Considering the testimony and evidence in the record, we cannot say that the trial court erred by finding that Mr. Purvis did not prove that his pre-existing lumbar injuries were aggravated by the accident. This assignment of error is without merit.
In his seventh assignment of error, Mr. Purvis argues that the trial court committed error by discounting the expert testimony of Dr. Whitney and Dr. Wohlfeiler because they did not review any post-accident medical records of other providers and as such, their opinions were of limited usefulness. In his eighth assignment of error, Mr. Purvis contends that the trial court erred by discounting the testimony of neurologists, Dr. Shamsnia and Dr. Beaucoudray, who opined that the medical conditions and disability they diagnosed post-accident were related to the accident, finding that their testimony was unreliable because they did not review prior medical records. These assignments can be addressed together.
A trial court may accept or reject, in whole or in part, the opinion expressed by an expert. Skillman, 171 So.3d at 418. The credibility of witnesses, including the evaluation of expert witness testimony, is a question of fact to be decided by the trier of fact. Id. at 415. As previously stated, the weight to be given to expert testimony is dependent on the facts on which it is based, as well as the professional qualifications and experience of the expert. Glass v. Magnolia School, Inc., 815 So.2d at 153-154. A claimant’s lack of credibility on factual issues can serve to hi diminish the veracity of his complaints to a physician. Davis v. Sonnier, 96-515 (La.App. 3 Cir. 11/6/96), 682 So.2d 910, 919.
Although Dr. Whitney, a chiropractor, and Dr. Wohlfeiler, an internist, evaluated Mr. Purvis after the accident, they did not provide continuing treatment. Because these doctors did not review the post-accident records of Mr. Purvis’ treating physicians reflecting his post-accident test results, symptoms, and continuing complaints, we agree that their knowledge of his post-accident condition was limited.
Both Dr. Shamsnia and Dr. Beaucoud-ray agreed that a patient’s medical history is the foundation of establishing a causal relationship between an incident and the patient’s injuries. Yet, both doctors admitted that they did not review any of Mr. Purvis’ medical records from before the accident, and Mr. Purvis did not give them a complete and accurate history of his prior conditions.
*378 Based on the limited information reviewed by the doctors, we find no manifest error in the trial court’s decision to give the testimony of Dr. Whitney and Dr. Wohlfeiler limited consideration or to discount the testimony of Dr. Shamsnia and Dr. Beaucoudi’ay regarding medical causation. These assignments of error are without merit.
In his ninth assignment of error, Mr. Purvis asserts that the trial court erred in stating that there is no indication in Dr. Steven Atkins’ records that he related Mr. Purvis’ cervical radiculopathy to the accident. Our review of the medical records reveals no error in the trial judge’s statement. This assignment of error is without merit.
In his tenth assignment of error, Mr. Purvis argues that the trial judge erred by not finding that he is totally disabled and by finding that he is capable of some type of sedentary work based on the 2013 surveillance video and his long drives to see Dr. Beaucoudray. He argues that the surveillance video was taken under | ¡.¡¡extenuating circumstances and that he only drives long distances to see Dr. Beaucoudray two or three times a year.
At trial, Mr. Purvis testified that he has been in excruciating pain since the accident. He agreed that in 2011, when his disability form was filled out, and in 2014, when his deposition was taken, he could not lift over ten pounds, sit, stand, or walk for over 15 minutes, reach overhead, push/ pull, climb stairs, stoop, kneel, crouch, or crawl. However, the surveillance video presented at trial contradicts Mr. Purvis’ claims regarding his post-accident pain and restrictions and casts some doubt on his credibility. The video shows that Mr. Purvis could and did, in fact, perform many of these physical activities.
We note, again, that Dr. Whitney found no significant difference in Mr. Purvis’ physical performance tests performed in June 2005 before the accident and in December of 2007 after the accident. We further note that while Dr. Shamsnia and Dr. Beaucoudray found Mr. Purvis to be disabled and incapable of working, Dr. Sumner opined that Mr. Purvis is physically able to work and does not have a brain injury that would preclude him from intellectually functioning in the capacity in which he previously functioned.
Where medical experts express differing views or opinions, great deference is given to the fact finder’s determinations, which should not be reversed on appeal absent a finding that no reasonable basis exists for them. McCarter v. Lawton, 09-1508 (La.App. 4 Cir. 7/21/10), 44 So.3d 342, 347. Accordingly, we find no manifest error in the trial court’s failure to find that Mr. Purvis is totally disabled and in finding that he is capable of working, at least in some capacity. This assignment of error is without merit.
In his eleventh assignment of error, Mr. Purvis argues that the trial judge erred in failing to award past and future lost wages, stating that Mr. Purvis was already disabled from working prior to the accident.
| ¾A plaintiff seeking damages for lost wages bears the burden of proving lost earnings, as well as the duration of time missed from work due to the accident. Burrell v. Williams, 05-1625 (La.App. 1 Cir. 6/9/06), 938 So.2d 694, 701. To obtain an award for future lost wages or earning capacity, a plaintiff must present medical evidence indicating with reasonable certainty that there exists a residual disability causally related to the accident. D’Ambrosia v. Lang, 07-298 (La.App. 5 Cir. 4/29/08), 985 So.2d 800, 816.
*379 In the present case, the trial judge found that Mr. Purvis failed to present relevant medical evidence that there exists a residual disability causally related to the accident. As previously noted, Dr. Whitney testified that he did not see any significant difference between Mr. Purvis’ physical performance tests before the accident and the tests after the accident. Further, Dr. Sumner testified that he believes Mr. Pur-vis is physically and intellectually able to work. Clearly, the trial court was not persuaded by the testimony of Dr. Shamsnia or Dr. Beaucoudray that Mr. Purvis is disabled and incapable of working.
The record supports the trial court’s finding that Mr. Purvis did not prove entitlement to past or future lost wages. Thus, we find no error in the trial judge’s denial of Mr. Purvis’ claim for lost wages. This assignment of error is without merit.
In his twelfth assignment of error, Mr. Purvis asserts that the trial judge erred in finding that it is not clear from the record and exhibits when Mr. Purvis’ chronic neck and back pain returned to its pre-accident state.
Based on our findings that the trial judge did not err in finding: 1) that plaintiff failed to distinguish his symptoms of cervical radiculopathy caused by the accident from his cervical issues before the accident; 2) that plaintiff failed to prove that his disc herniation and bulging were caused by the accident; and 3) that | ^plaintiff did not prove that his pre-exist-ing lumbar issues were aggravated by the accident, we find no merit in this assignment of error.
Finally, in his thirteenth assignment of error, Mr. Purvis contends that the trial judge erred in finding that he did not prove damages in excess of $100,000.
In light of the record viewed in its entirety, we find no manifest error in the trial judge’s conclusion that Mr. Purvis did not prove by a preponderance of the evidence that he suffered damages in excess of $100,000. The evidence established that Mr. Purvis suffered from many problems prior to the accident, including neck pain, back pain, anxiety, and depression. It was Mr. Purvis’ burden to prove the nature and extent of any new injuries suffered as a result of the incident during his surgery at WJMC. Mr. Purvis also had the burden of proving his special and general damages. Considering all of the testimony and evidence, the trial judge did not commit manifest error by finding that Mr. Purvis failed to carry his burden. Accordingly, this assignment of error is without merit.
DECREE
For the foregoing reasons, we affirm the trial court’s judgment in favor of the PCF, dismissing plaintiffs claims against it with prejudice.
AFFIRMED

. The "Trendelenburg position” is defined in the McGraw-Hill Concise Dictionary of Modem Medicine (2002) as “[a] position in which the patient is on an elevated and inclined plane, usually about 45 degrees, with the pelvis higher than the head and the feet over the edge of the table.” It is defined in the Medical Dictionary for the Health Professions and Nursing (2012) as "[a] supine position on the operating table, which is inclined at varying angles so that the pelvis is higher than the head.”

. Dr. Louis Levin was the anesthesiologist for Mr. Purvis’ surgery.

. A medical review panel was convened and issued an opinion on October 14, 2010, finding that the evidence did not support the conclusion that Drs. Belott, Burns, or Levin breached the standard of care. The panel further found that there were material issues of fact, not requiring expert opinion, as to the liability of WJMC.

. Although the surveillance video was not taken in 2011 or 2014, Mr. Purvis contends that he has had excruciating pain since the accident.

. According to Dr. Whitney, cervicalgia is neck pain; cervicocranial syndrome is headaches and neck pain; and cervical brachial syndrome is “a bone in your neck and a brachial plexus coming off your neck down into your neck area.” Dr. Michael Wohlfeiler described cervical brachial syndrome as "pressure or stretching of the brachial plexus,” and stated that it causes pain in the neck and shoulder and may radiate into the arm and hand.